IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**KESHA DEE GOLDSBY,**         Case Number 1:14cv383

    Plaintiff,         Judge Benita Pearson

    v.         Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.         REPORT AND RECOMENDATION

## INTRODUCTION

Plaintiff Kesha Dee Goldsby seeks judicial review of Defendant Commissioner of Social Security's decision to deny supplemental security income ("SSI"). The district court has jurisdiction under 42 U.S.C. § 405(g) and § 1383(c)(3). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). (Non-document entry dated February 20, 2014). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

## PROCEDURAL BACKGROUND

Plaintiff filed an application for SSI on May 24, 2011 alleging disability due to cognitive disabilities. (Tr. 113, 138). Her claim was denied initially and on reconsideration. (Tr. 47, 59). Plaintiff requested a hearing before an administrative law judge ("ALJ"). (Tr. 84). At the hearing Plaintiff, represented by counsel, and a vocational expert ("VE") testified. (Tr. 23, 31). On September 27, 2012, the ALJ concluded Plaintiff was not disabled. (Tr. 8). Plaintiff's request for appeal was denied, making the decision of the ALJ the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 416.1455, 416.1481. On February 20, 2014, Plaintiff filed the instant case. (Doc. 1).

**FACTUAL BACKGROUND**

*Plaintiff's Background, Vocational Experience, and Daily Activities*

Born November 8, 1990, Plaintiff was twenty years old at the time of her application. (Tr. 18). She graduated from high school, where she was enrolled special education classes, and has completed some college coursework. (Tr. 18, 27, 31, 33). Plaintiff has no past relevant work experience. (Tr. 18).

Plaintiff lived in a house with her mom. (Tr. 27-28, 35). Concerning daily activities, Plaintiff cooked, washed dishes, did laundry, shopped, maintained personal care, went to the movies, read, visited family, went to college, attended a study group, and used a computer. (Tr. 27-30, 35-36). She never attempted to get a driver's license. (Tr. 27). Plaintiff took a bus to school, where she studied art five hours per week. (Tr. 30). At the hearing, Plaintiff said she had to repeat two courses but eventually passed. (Tr. 36). During the summer, Plaintiff planned to apply to work at Target, where she thought she would not have trouble working. (Tr. 32). Plaintiff said she was able to do simple math with a calculator or paper and pencil and could read but had trouble comprehending certain information. (Tr. 34). She did not take any medication or participate in counseling and denied having a medical condition that required seeing a doctor. (Tr. 34). Plaintiff participated in vocational rehabilitation but she said she stopped returning their calls because she did not understand what was required of her. (Tr. 35).

*Medical and Education Evidence*

Plaintiff was diagnosed with learning and cognitive disorders in 2002, while she was in fifth grade. (Tr. 235). In addition, she was placed on an individualized education plan ("IEP") in eighth grade to improve her reading, writing, math, and communication skills. (Tr. 199-203, 245).

An evaluation team report ("ETR") was completed on May 20, 2004. (Tr. 208). The report indicated Plaintiff enjoyed reading for pleasure but her fund of knowledge in reading, science, social studies, and math was very low and she did not communicate in class. (Tr. 210-12, 223-224). Testing administered as part of the ETR revealed intellectual deficiency and a low average range of functioning in socialization skills. (Tr. 219-21). Plaintiff's teachers indicated she completed her work, but often did so inaccurately. (Tr. 223-24). According to one teacher, Plaintiff had made little progress in class and had difficulty processing information. (Tr. 222). She recommended Plaintiff receive a lighter work load with a greater focus on accuracy and more effort centered around spending more time on fewer problems. (Tr. 222).

At college, Plaintiff's record indicates she failed three courses – college composition, an introductory child development course, and cultural anthropology. (Tr. 188). She carried a cumulative grade point average of 2.01 and had earned fifty-four credit hours. (Tr. 190).

Plaintiff received services from the Ohio Bureau of Vocational Rehabilitation ("BVR"). (Tr. 244). On November 14, 2008, Richard G. Litwin, Ph.D., administered a psychological evaluation, which recounted Plaintiff's difficulty at school but unremarkable medical history. (Tr. 245). At the time, Plaintiff was "not a social person", did not date, and often stayed in her room and played video games. (Tr. 245). Dr. Litwin described Plaintiff as "quite attractive" and noted her desire to become a fashion designer. (Tr. 246). He said Plaintiff's quietness during the interview appeared to mask greater difficulty than she was comfortable admitting but Plaintiff did not have trouble putting forth adequate effort over the two hour examination. (Tr. 246). Plaintiff functioned in the borderline range of intelligence at a "very low age level . . . in line with someone who has mild mental retardation". (Tr. 246-47). Dr. Litwin diagnosed learning disability (due to underachievement in math, writing, reading, expressive language, and

3

memorization) and borderline intellectual functioning then assigned a global assessment of functioning ("GAF") score of 65.[1] (Tr. 248). He also commented that Plaintiff may be more depressed and socially anxious than was readily apparent. (Tr. 248). Dr. Litwin thought Plaintiff would be better doing work tasks involving objects and not people and when not working as part of a close team effort. (Tr. 249).

Plaintiff received job training at Target. (Tr. 250). She performed well over a ten-day period of work adjustment and demonstrated she could work days on a flexible schedule but she sometimes needed extra instruction, was fragile in work stamina, and needed to develop a sense of urgency. (Tr. 250).

On June 24, 2009, Plaintiff accepted a job as salesclerk at the Conway store. (Tr. 252). However, she was terminated about a month thereafter "when a new manager came in and cleaned house" because her work speed was not "up to par." (Tr. 253).

Over the next year, Plaintiff applied to several retail stores in the area with her job coach. (Tr. 254-55, 257-60). She received one interview, but the interviewer said she needed to have more confidence and be more open. (Tr. 255). On November 24, 2009, her job coach indicated Plaintiff continued to look for high end employers without success. (Tr. 256). The coach said Plaintiff needed to do more on her own, although she was busy with classes, and needed better outerwear and clothes if she wanted to work in high end retail. (Tr. 256). Plaintiff stopped returning calls or attending meetings in July 2010. (Tr. 261). Services were terminated because

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood or mild insomnia) OR some difficulty in social, occupational, or school functioning, (e.g., occasional truancy or theft within the household) but generally functioning pretty well, has some meaningful interpersonal relationships." *Id*.

she was "not able to progress toward employment or homemaking." (Tr. 266).

*State Agency Medical and Psychological Assessments*

On July 7, 2006, consultative examiner David V. House, Ph.D., examined Plaintiff. (Tr. 227). Plaintiff arrived late to the interview and presented as "somewhat intellectually limited". (Tr. 228). She had no significant medical history and no trouble sleeping, although her mother thought she slept too much. (Tr. 228-29). Plaintiff's mother said Plaintiff was a slow learner and had difficulty associating with peers but had no problems getting along with her teacher. (Tr. 228). Her mother described Plaintiff as easy going and said she generally responded appropriately to discipline. (Tr. 228). Plaintiff's full scale IQ score placed her in the mildly mentally retarded range, but because the difference between her verbal and performance scores was statistically significant, Dr. House believed the appropriate diagnosis was for borderline intellectual functioning. (Tr. 230). Plaintiff's adaptive behavior composite was in the deficient range but Dr. House said the diagnosis of borderline intellectual functioning was still appropriate because she demonstrated, at least to some degree, borderline intellectual skill. (Tr. 231). Dr. House diagnosed mood disorder (not otherwise specified) and borderline intellectual functioning and assigned a GAF score of 51.[2]

On August 9, 2011, consultative examiner Matthew Paris, Psy.D., examined Plaintiff. (Tr. 234). Plaintiff denied mental health symptoms and was guarded throughout the interview. (Tr. 234). Plaintiff said she had a good relationship with her siblings and mother and kept in contact with her father by phone or in person. (Tr. 235). She said she had been involved in some dating relationships and had one best friend but few friends overall. (Tr. 235). She said she got

---

2. A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers). *DSM-IV-TR*, at 34.

along well with others as a child, which Dr. Paris indicated was inconsistent with the record. (Tr. 235). Plaintiff held one job for a month in 2009 and told the examiner she was fired because others were "jealous" of her. (Tr. 236). Plaintiff admitted to a history of suicidal ideation. (Tr. 237). She said she exercised three times per week, cooked, cleaned, did laundry, maintained personal hygiene, shopped, and was able to help with child care, although some of the activities took longer than expected. (Tr. 237). Dr. Paris observed markings on Plaintiff's arms consistent with self-harming behavior, which Plaintiff denied. (Tr. 237).

Dr. Paris concluded Plaintiff did not meet the criteria for mild mental retardation due to her ability to exhibit self-sufficient behaviors including taking public transportation to school, attending college courses, taking care of her daily needs, and being somewhat social in the past. (Tr. 240). Dr. Paris said Plaintiff met the diagnosis for borderline intellectual functioning due to cognitive limitations. (Tr. 240). He concluded Plaintiff exhibited "moderate to significant deficiencies in her ability to understand, remember, and carry out instructions[]", was "able to perform simple tasks and multi-step tasks the majority of the time" but demonstrated "moderate to significant deficiencies in her ability to maintain attention and concentration as well as persistence and pace on a consistent basis." (Tr. 241). She had moderate deficiencies with regard to her ability to respond appropriately to supervision, coworkers, and pressure in a work setting. (Tr. 241-42).

*The ALJ's Decision*

The ALJ determined Plaintiff had severe impairments of borderline intellectual functioning and learning disorder, not otherwise specified. (Tr. 13). However, the ALJ found Plaintiff's impairments did not meet or equal a listed impairment. (Tr. 14). Next, the ALJ determined Plaintiff had the RFC to perform a full range of work at all exertional levels with the

6

following nonexertional limitations: she would need simple, routine tasks with simple, short instructions; she could make simple work related decisions in a workplace involving few workplace changes; and she could not be required to read instructions, write reports, or perform math calculations. (Tr. 15). Considering Plaintiff's age, education, work experience, RFC, and VE testimony, the ALJ determined Plaintiff was able to find work as a kitchen helper, cleaner, or laundry worker and therefore, was not disabled. (Tr. 18-19).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

7

result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id*. The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ's RFC determination and corresponding step five hypothetical were not based on substantial evidence because they do not accurately reflect the record, including Dr. Paris' opinion and Plaintiff's testimony and work history. (Doc. 13).

A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. § 416.929. An ALJ must also consider and weigh medical opinions. § 416.927. When a claimant's statements about symptoms are not substantiated by objective medical evidence, the ALJ must make a finding regarding the credibility of the statements based on a consideration of the entire record. Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, *1.

Here, the ALJ determined Plaintiff had the RFC to complete a full range of work at all exertional levels, but with various nonexertional limitations such that she was limited to simple routine tasks with simple short instructions, making simple work related decisions, and having fewer workplace changes. (Tr. 15). In addition, Plaintiff could not be required to read instructions, write reports, or perform math calculations. (Tr. 15).

To support the RFC determination, the ALJ considered evidence of record, including consultative examiner Dr. Paris' August 9, 2011 opinion. (Tr. 17). The ALJ afforded "considerable weight" to Dr. Paris' opinion that Plaintiff's abilities were moderately impaired because the opinion was consistent with the ALJ's observation of Plaintiff, namely that she had difficulty concentrating and persisting at tasks and tended to misinterpret certain situations likely due to her cognitive limitations. (Tr. 17). The ALJ weighed these observations against the fact Plaintiff was able to take public transportation to school, attend college level courses, take care of her daily needs, and interact superficially with classmates. (Tr. 17).

Plaintiff contends the ALJ did not "accurately convey" the level of limitations found by Dr. Paris; namely that in his report, Dr. Paris described Plaintiff's mental limitations as "moderate to significant". (Doc. 13, at 5). Plaintiff argues this is not an issue of semantics, but

9

rather reversible error because the ALJ's reasons for rejecting part of Dr. Paris' opinions were not sufficient, Dr. Paris' opinion is supported by Plaintiff's work history, and the ALJ's analysis of Plaintiff's academic achievements were flawed. (Doc. 13, at 7).

Plaintiff's argument is not well-taken because the ALJ's RFC determination is wholly consistent with Dr. Paris' conclusions. To this end, like the ALJ, Dr. Paris concluded Plaintiff did not meet the criteria for mild mental retardation due to her ability to exhibit self-sufficient behaviors including taking public transportation to school, attending college courses, taking care of her daily needs, and being somewhat social in the past. (Tr. 240). Dr. Paris said Plaintiff met the diagnosis for borderline intellectual functioning due to cognitive limitations. (Tr. 240). He concluded Plaintiff exhibited "moderate to significant deficiencies in her ability to understand, remember, and carry out instructions[]", was "able to perform simple tasks and multi-step tasks the majority of the time" but demonstrated "moderate to significant deficiencies in her ability to maintain attention and concentration as well as persistence and pace on a consistent basis." (Tr. 241). She had moderate deficiencies with regard to her ability to respond appropriately to supervision, coworkers, and pressure in a work setting. (Tr. 241-42). As the Commissioner points out, "Plaintiff has failed to point to any specific functional limitation set forth by Dr. Paris that was not included in the RFC finding". (Doc. 15, at 8).

Moreover, to the extent Dr. Paris' opinion differs from the RFC assessment, the ALJ is not required to adopt a physician's opinion verbatim. 20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."); SSR 96-5p, 1996 WL 374183, at *5 ("Although an adjudicator may decide to adopt all of the opinions expressed in a medical source statement, a medical source statement must not be equated with the administrative finding known

as the [RFC] assessment."). Rather, the ALJ need only provide good reasons for the weight assigned and support her decision with substantial evidence.

Here, the ALJ did just that. She afforded "considerable" weight to Dr. Paris' opinion and, as noted above, adopted an RFC consistent with the opinion. The ALJ also thoroughly summarized Dr. Paris' examination, as well as the opinions of Drs. Litwin and House and the state agency medical consultants. (Tr. 17). Further, the ALJ considered Plaintiff's education records, including IQ testing and participation in the Bureau of Vocational Rehabilitation. (Tr. 16). In addition, the ALJ considered the fact Plaintiff had no limitations in activities of daily living, was able to participate in a study group and be in a classroom environment, travel independently, shop, go to the movies, and attend community college. (Tr. 15). In short, the ALJ supported her RFC determination with substantial evidence of record.

Next, Plaintiff argues the ALJ misconstrued Plaintiff's academic achievements because she did not acknowledge Plaintiff's testimony that she required an accommodation in her college classes. (Doc. 13, at 7). Specifically, Plaintiff relies on that portion of her testimony wherein she said, "I have a problem comprehending certain information. I have a problem comprehending, and I will have to read it over again, or have someone read it to me." (Doc. 13, at 7) (quoting Tr. 34). In addition, Plaintiff relies on the fact she has had to repeat several college classes, even though she eventually passed them. (Doc. 13, at 7).

However, review of the hearing testimony belies Plaintiff's argument. When asked whether Plaintiff was provided with a reader by her college, she said in no uncertain terms, "No." (Tr. 34). In short, the ALJ did not err in considering Plaintiff's completion of some college coursework to formulate her RFC.

Plaintiff's remaining argument is that the ALJ erred by relying on the hypothetical question which mimicked the inaccurate RFC determination. (Doc. 13, at 8). But, because the RFC was supported by substantial evidence, Plaintiff's argument which is predicated on a flawed RFC is void ab initio. Stated differently, the Commissioner met her burden at the fifth step by relying on VE testimony in response to a hypothetical question which accurately portrayed Plaintiff's limitations. *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987); *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516-17 (6th Cir. 2010). Therefore, Plaintiff's argument related to step five is not well-taken.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI benefits applied the correct legal standards and is supported by substantial evidence. Therefore, the undersigned recommends the Commissioner's decision be affirmed.

      s/James R. Knepp II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).